# CASES IN CHANCERY.

DECEMBER TERM, 1849.

---

## The TRENTON BANKING Co v. JOHN McKELWAY.

The route of the raceway of the Trenton Delaware Falls Company was located over certain lots belonging to B. The Company appointed a committee to negotiate with the land owners for the purchase of the lands over which the route was located. M., who was President, and one of the acting managers of the Company, told the committee that he would take upon himself to effect an arrangement with B for the purchase and possession of his said lots for the Company, and the committee thereupon intrusted the negotiation with B to M. M. bought B's lots for $50 a lot, and took a deed for them in his own name, the deed stating the consideration to be $100 a lot. The Company offered B what he had paid for the lots; and went on and constructed their raceway over the lots. B. was perpetually enjoined from bringing ejectment to recover possession.

M. owned another lot over which the raceway was located and constructed, and was President and one of the acting managers of the Company at the time of such location and construction, and made no objection to, but took part in the direction of the proceedings of the Company in locating and constructing the raceway on and over the said lot. He was perpetually enjoined from bringing ejectment to recover possession.

An issue was ordered to ascertain the value of the lots.

The bill, filed January 9th, 1845, states that an act of the Legislature, passed Feb. 16, 1831, incorporated a company under the name of " The Trenton Delaware Falls Company," and authorized said Company to erect a wing dam in the Delaware river, between the mouth of the Assanpink and the head of Wells's Falls, and a raceway along and near the bank of said river, in the neighborhood of Trenton, and to cut a main raceway from said wing dam to any point below the Trenton Falls, and not exceeding one and a half miles therefrom; and authorizng the said Company to enter on all lands, &c.; and when a

location of said wing dam and the route or routes and location of said main raceway, branches and improvements should be determined, and a survey thereof, with the lands necessary for the same, should be completed and deposited in the office of the Secretary of State, it should be lawful for the Company to enter upon, take possession of and use all and singular such lands, subject to such compensation to be made therefor as in the act after provided. That a location, &c., was made, &c., and a survey thereof, with the lands necessary for the same, was completed, and deposited in the said Secretary's office.

That the route of the said main raceway was located through a part of the township of Nottingham, and was laid out over and across certain lots of land and premises in said township belonging or said to belong to one Thomas Black.

That, at a meeting of the managers of said Company, the said managers proceeded to consult upon the measures necessary to be taken by the Company to agree with the owners of the lands along the route of said raceway, for the purchase of the same; and the said managers appointed Wm. P. Sherman, the Treasurer, and Joseph C. Potts, the Secretary of said Company, to negotiate with several of the said land owners for the purchase of the said lands, and among others to negotiate with said Thos. Black for the purchase of his lands. That John McKelway, (the defendant,) then being the President or one of the managers of the said Company, and present at the meeting of the managers above referred to, after the appointment of the said committee, informed the said Sherman and Potts, or one of them, that they need not communicate with the said Thomas Black for the purchase of his lands, as he, McKelway, would personally attend to that arrangement with said Black, on the part of the Company, he, McKelway, having, as he stated, peculiar facilities and opportunities for effecting the purchase of said lands from said Black, upon terms favorable and advantageous to the Company, as he, McKelway, was attending in the family of said Black as a physician, and he would take upon himself to effect an arrangement with the said Black for the purchase or possession of said lands for the Company.

That, in pursuance of such voluntary offer on the part of McK.,

the negotiation for the purchase of said lands from said Black was intrusted to McK., then President, or one of the acting managers of the Company, the said committee not deeming it necessary for them to attend further thereto.

That said McK. obtained a deed from said Black, conveying the title of said lots of land ; and, in place of having them conveyed directly to the said Company, caused or permitted his own name to be inserted in said deed ; and also caused or permitted the sum of $100 each, to be inserted in said deed as the consideration money; whereas the said McK. had given but $50 to Black for each of said lots; and McK. subsequently informed the President of the Company, that he had purchased the said lands of Black, and offered to convey the same to the Company upon the payment to him of the sum he had given for said lands, which he stated to be $100 each. But the Company having been previously informed that $50 each was the true consideration paid to Black, declined to pay McK. $100 each informing him that $50 each was the true amount paid by him, which they were ready to pay him, as they considered him the agent of the Company in the purchase of said lands, and that he had volunteered to act as such on the part of the Company and that they considered him as holding the said lands as the trustee of the Company, and for their use.

That for the purpose of constructing their main raceway, the said Company entered into the possession of a certain other small piece of land, in said township of Nottingham, over which the location of said raceway had been made, which said land was said to belong to or be in the occupation of the said McKelway ; and that the said entry upon and occupation of the land last named was made by the Company, by and with the full consent and approbation of said McK., he being at the time President or one of the acting managers of the Company, and uniting in and directing all the acts of the Company, and knowing that the said raceway was to be constructed across said land, and consenting in and directing such location to be made.

That the said act of incorporation provides for the appointment of commissioners to assess the value of the land taken by the Company, and directs that upon the tender of such valuation

to the land owner the title shall thereupon vest in the Company. And the complainants are informed and believe, that the said Company would have proceeded in that manner to obtain the title to the said lands if they had not been permitted, authorized and directed by said McK. to enter upon said lands, and use and occupy the same, with the full understanding that he would convey the same to the Company when called upon to do so.

That said Company have erected their raceway, branches and improvements, at an expense of more than $200,000, and put the same in operation according to the purposes and provisions of their charter; and that a very large amount of capital has been invested in the erection of numerous mills and manufactories along the route of their raceway, which are supplied with water therefrom.

That, some time in 1843, the said Company having become embarrassed in their affairs, a bill was filed in this Court by A. Corrigan, for himself and other creditors of said Company, praying, &c.; and such proceedings were had thereon that receivers were appointed, and were ordered to make sale of the lands and effects of said Company, and that the receivers accordingly did, on the 26th February 1844, make public sale of said lands, including the raceway of the Company; and at such sale the complainants became the purchasers thereof, and entered into the possession of the same, and, among others, of the lots of land above described.

That some time in October, 1844, McK. commenced an act of ejectment, in the Supreme Court, against the complainants, for the lands above mentioned with the usual notice to the complainants, as the tenants in possession, to appear, &c., on the second Tuesday of November, 1844.

That although the complainants have become the purchasers of said premises, and are in the possession thereof under the sale made as aforesaid, under the direction of this Court, yet that certain persons pretending to be creditors of said Court have questioned the title of the complainants, and have filed a bill and commenced proceedings in this Court, disputing the validity of the title made to the complainants, and praying this Court to vacate and set aside its decrees and proceedings in the aforesaid suit in which

said Corrigan is complainant, and to declare null and void the sale of the works of said Company made by the said receivers to these complainants, which bill and proceedings are now pending and undetermined in this Court; and the complainants believe that, while the said matters involved in the said proceedings remain pending, the complainants will receive the aid and protection of this Court to preserve the entire possession and unity of said works, to the end that, if the said sale should be vacated by any decree of this Court, and the complainants required to return the possession of the said works to the custody of the receivers, the complainants may be enabled so to do in the same condition as received from the receivers; and the complainants believe, that while the proceedings aforesaid remain undetermined, the said works still remain under the care, custody, and direction of this Court.

That should said McK. be permitted to proceed in said ejectment, and obtain the possession of said lands, it will be in his power to destroy entirely the value of the raceway, works and improvements of the said Company now completed, and to stop the mills and manufactories now in operation; which will produce an immediate injury to the complainants, involve in ruin many of the mill owners along the raceway, who have invested therein large amounts of capital, and throw out of employment a great number of workmen, who, with their families, are dependent for their employment and subsistence thereupon; inasmuch as said McK., by obtaining the possession of said lots, may draw off the water from the raceway, and refuse to sell the said lands to the complainants, or only upon such terms as would be highly injurious and oppressive.

That if it shall appear that said McK. has not received from said Delaware Falls Company a suitable compensation for the lands so taken and occupied by them, although the complainants maintain and insist that said McK. should seek his redress therefor against said Falls Company, and not against the complainants; nevertheless, the complainants are ready and willing that the value of such lands should be ascertained and estimated, in the mode directed by said act of incerporation of said Falls Company, or in any other manner this Court may direct, an

are ready and willing to pay the amount so to be ascertained in the manner directed by this Court.

That an agent of the complainants has, in a friendly manner, applied to said McK., and requested him to come to a fair settlement, &c.

The bill prays that McK. may be restrained by injunction from prosecuting the said action of ejectment; and for such further and other relief, &c.

The injunction was allowed.

The defendant put in his answer on the 19th February, 1845. He admits that the managers of the Falls Company met and consulted, &c., as stated in the bill, and appointed William P. Sherman and Thomas J. Stryker, not Joseph C. Potts, to negotiate, &c., as stated in the bill.

He admits that he was, at the time, President of the Board of Managers of said Falls Company, and present at said meeting, and that said Sherman and Stryker requested him to aid in the negotiation with Black for his land; and on that request he believes he did say to said Sherman or Stryker that they need not attend or communicate with Black, as he, the defendant, would personally attend to that arrangement on the part of the Company, as he was acquainted with Black and frequently saw him, and that he would take upon himself to effect an arrangement with Black for the purchase and possession of said lands for said Falls Company; but he denies that he said he had peculiar facilities and opportunities of effecting said purchase.

He admits that, in pursuance of said offer, the negotiation for the purchase of Black's land was entrusted to him, he being President and one of the acting Managers of said Falls Company.

He admits he obtained a deed from Black, conveying the title of said lots of land to him; but he denies that said deed was ever intended to be made by Black to the said Falls Company, or that he ever permitted his own name to be inserted in the deed instead of said Falls Company.

He says that, when he undertook to negotiate with Black and

applied to him to sell said lots to the said Falls Company, the price demanded by Black for said land was $300; and, after the Company refused to take said lots at that price, and after the negotiation for them by this defendant in behalf of said Company had ceased for several months, he entered into a negotiation for them on his own account, and finally agreed to purchase said lots on his own account for $250. He denies that he caused or gave any permission to have the sum of $100 inserted in said deed as the consideration money for the purchase of said lots of land.

He admits he gave Black $250 for his land, which was at the rate of $50 per lot for each of the lots purchased by him of Black. But that the sum for which he first contracted for said lots was $300; and that afterwards, when said Falls Company declined taking them, Black agreed to sell them to this defendant for $250.

He denies that he subsequently informed the President of said Falls Company that he had purchased said lands of Black and offered to convey them to said Company upon payment to him of the sum he had given. But he has no recollection that he stated that he gave $100 for each lot, and therefore denies the same.

He admits that said Falls Company declined to take said lots, or to pay him for them, either at $100 or at $50 per lot; but he denies that said Company ever tendered themselves ready or willing to pay him $50 per lot or any other sum; and also denies that said Company ever informed him that $50 was the true amount paid by him for said lands, which they were ready and willing to pay, or that they considered him as holding said lands as the trustee of said Company.

He admits that said Company, for the purpose of constructing their main race-way, entered into the possession of a certain other small piece of land in Nottingham; but he denies that the location of said race-way, as originally surveyed and located by the engineer of said Company, was over and across said lot; and he has no knowledge, information or belief that any survey or location of said race-way was ever made over and across the said land belonging to him. But says, that the location and survey of the route of the main raceway, as made and deposited in the Secretary's office, did not touch, take or run over any more than

two of the lots of this defendant, purchased by him of said Black; and that, after the said location thus made, and without any new route having been located or surveyed according to the provisions of the charter of said Falls Company, the said Company varied from the route of the main race-way thus located and filed, and constructed their said main race-way on, over and across three other of the said lots of land purchased by said defendant of said Black, and also on, over and across three other lots of this defendant which he had purchased of —— Shoemaker; and which three last mentioned lots lie on the west side of a street called Asbury street. And of the five lots purchased of Black, three lie on the east side of said Asbury street, and the others lying still further east, and are divided from the last mentioned by an alley or street called George street, as by a map of said lots correctly made by an engineer of said Company, and now in the possession of this defendant, will appear.

He admits that he knew that the said Company entered upon and occupied the said lot; but denies that he ever gave said Company any consent so to do, or that they ever paid him for said lot, or that he ever entered into any agreement with said Company to convey to them the said lot or to allow them to enter upon and occupy it.

He denies that he ever permitted, authorized or directed the Company to enter upon the said lands and to use and occupy the same with the full understanding that he would convey the same to said Company when called upon to do so.

He admits that the Company have erected their raceway, &c. at an expense of more than $200,000, and put the same in operation; but he denies that it was done according to the purposes and provisions of their charter. And admits that a very large amount of capital has been invested in the erection of numerous mills and manufactories, &c. But he says that all the money expended in erecting said race-way, branches and improvements of said Company was expended in the erection of their race-way, branches and improvements above the lots of land of said defendant, except about $3,000 or $4,000.

He admits the appointment by this Court of Receivers of said Falls Company; and that the Receivers were ordered to make

sale, &c. ; and that the complainants became the purchasers of the property of the Company and entered into possession thereof; and that the complainants entered into possession of the lots of land of this defendant in the complainant's bill described. But he denies that the Receivers ever sold said lots of land to said complainant, or had any authority under said decree to sell said lots of land, or that the complainants ever purchased said lots or have any title whatever to the same; and insists that their entry and possession of them is wholly illegal and tortious.

He admits he has brought ejectment. He denies that the complainants ever became the purchasers of the lots of land and premises belonging to him in the complainant's bill described, or were ever put in possession thereof under said sale, although he admits that they did become the purchasers of lands and premises to which the said Falls Company had a legal title at the time of said sale made by the Receivers, and that they entered into possession, under said sale, of such lands as said Falls Company had a legal title to.

He says that the bill mentioned in the bill of complaint as having been filed to set aside the proceedings and decrees of this Court in the case of Corrigan has been dismissed ; and he therefore denies that there are any proceedings pending and undetermined in this Court in which the validity of the sale of the Receivers is questioned. But he insists that if the validity of the Recevers' sale to the complainants of the property of said Falls Company was qusstioned by any proceedings in this Court, it affords no legal or equitable ground to take from this defendant his property which was not included in said Receivers' sale ; and which said Receivers, as the complainants well knew at the time of their purchase, had no right so to do. And he insists, that the complainants are entitled to no aid or protection from this Court under the pretext set forth in their bill, that, if they should be required to return the possession of said work to the custody of the Receivers, the complainants may be enabled to do so in the same condition as they were received from said Receivers ; because the said Receivers never sold the said lots of land of the defendant in the complainants' bill described to the complainants, nor did the complainants receive possession of said lots from

the Receivers ; and that the complainants have no legal or equitable right to the possession of the said lots of land of the defendant.

He denies that, if he is permitted to proceed in the ejectment and obtain possession of said lands of defendant, it will be in his power to destroy entirely the value of the race-way, works and improvements of the Company now completed, or to stop the mills and manufactories now in operation, or produce irremediable injury to the complainants ; though he admits he might stop three of the mills which have been erected below his said lots of land, and which are situated on the property purchased by the said Falls Company of J. B. Sartoni ; and only one of said mills is in operation, and the others only partially so. But he has no desire to do any injury to the mill owners, the workmen employed in said mills or their families.

He insists that the complainants knew perfectly well the situation of the title to these lots of land of this defendant at the time they made the purchase of the real estate and franchises of the Falls Company, Ph. Dickerson, the President of the Trenton Bank, having been President of the Falls Company. And this defendant is the more induced to believe that the complainants knew that the Falls Company had no title to the lots of land of this defendant in their bill mentioned, from the fact that all the works and improvements of said Falls Company, with their franchises, were sold free of all incumbrances, by the Receivers, of whom said Ph. Dickerson was one, for the small sum of $50,000 ; the lands and improvements of said Company, independent of their corporate franchises, having cost, according to the statement of the bill, more than $200,000.

He says he has never received any compensation for his said lots of land from said Falls Company, and that said Company have, by a decree of this Court, been declared insolvent ; and that it would be inequitable and unjust to turn him over to an insolvent corporation to seek payment for lands which the complainants are now enjoying, and which they never purchased and for which they never paid anything.

He says that the value of his lands taken possession of by said Falls Company cannot now be ascertained and estimated in the

mode and manner directed by their act of incorporation, because the provisions of said act were wholly violated and disregarded in relation to six of the lots of land of this defendant.

He further insists, that this Court has no power to take away the lands of this defendant and give them to a private corporation, nor to compel him to part with them against his consent, nor determine or ascertain the sum for which he shall be compelled to sell them.

He denies that the complainant ever applied to him previous to the commencement of said ejectment and requested him to come to a fair and just settlement of the matters in controversy. But he says that previous to the commencement of said ejectment he repeatedly urged upon the Trenton Delaware Falls Company to come to a settlement with him, which they wholly neglected and omitted to do.

On this answer, a motion was made to dissolve the injunction.

*W. Halsted* in support of the motion. He cited 6 *Hill's Ch. Rep.* 61 ; 5 *Barn. & Cres.* 221 ; 1 *Wend.* 380 ; 1 *Hoffman's Ch.* 166 ; 1 *Clark's Ch. Rep.* 84 ; *Saxt. Ch.* 298.

*P. D. Vroom* contra. He cited 1 *Mad. Ch.* 209 ; 1 *John. Ch.* 354 ; 6 *Ib.* 166, 9.

THE CHANCELLOR retained the injunctions until the hearing of the cause.

Depositions were taken, and the cause was brought to hearing on the pleadings and evidence.

*S. G. Potts* and *P. D. Vroom* for the complainants. They cited 1 *John. Ch.* 353 ; 6 *Ib.* 167 ; *Story on Agency,* sec. 211 ; 1 *Story's Eq. Jur.,* sec. 321, 2 ; 1 *Peters' C. C. Rep.* 307 ; 2 *Stark. Evid.* 745 ; 1 *Story's Eq.,* sec. 385, 6 ; *Ang. & Ames on Corp.* 593 ; *Paley on Agency,* 10, 11 ; *Saxt. Ch.* 10.

*W. Halsted* for the defendant. He cited *Gresl. Eq.* 241 ; 2

*Story's Eq.*, sec. 1201 a ; *Eden's Ch. Rep.* 515 ; 2 *John. Ch. Rep.* 405 ; *Prec. in Ch.* 261 ; 2 *Ves. Sen.* 90 ; 1 *Harr. Ch.* 200 ; *Saxt. Ch.* 298.

THE CHANCELLOR.   The Trenton Delaware Falls Company was incorporated in 1831.   The route of the main raceway, as located, crossed certain lots belonging to Thomas Black.   The Company appointed a committee to negotiate with the land owners, including Black, for the purchase of the lands on and over which the raceway had been located.   The defendant, who was then President, and one of the acting managers of the said Company, told the said committee that they need not communicate with Black ;   that he, the defendant, would attend to that arrangement on the part of said Company, and would take upon himself to effect an arrangement with Black, for the purchase and possession of his said lots for the said Company ;   and in pursuance of this offer, the negotiation for the purchase of these lots was intrusted by the committee to the defendant.   The defendant bought the lots of Black for $50 a lot, and took a deed for them in his own name, the deed stating the consideration to be $100 a lot.   The bill states, that the defendant subsequently offered to convey the lots to the Company on the payment to him of $100 a lot ;   but that the Company, having been previously informed that they were bought by the defendant for $50 a lot, declined to pay more, and informed the defendant that they were ready to pay him what he had paid or agreed to pay ;   and that the Company considered him as holding the lots as trustee for the Company for their use.   The answer to this statement of the bill is so unsatisfactory that I must take the statement as a part of the case.   The Company constructed their raceway over the said lots, and also over another small lot of land belonging to the defendant, with the knowledge of the defendant, and without any objection made by him, he still being the President and one of the acting managers of the Company ;   the Company, under these circumstances, not taking any of the measures prescribed by the charter to ascertain the value of these lots, and acquire the legal title thereto, which the bill says they would have done if they had not been permitted, authorized and directed by the defendant

to enter upon, use and occupy the same with the full understanding that the defendant would convey the said lots to the Company when called upon to do so. The answer admits that the Company took possession of and constructed their raceway on and over the said lots with his knowledge, but denies that he permitted, authorized or directed the Company to enter upon, use and occupy the said lots with the full understanding that he would convey the same to the Company when called upon to do so. This part of the answer also, is unsatisfactory. The defendant may use the words "with the full understanding" in a different sense from that in which they are used in the bill. It is not a sufficient denial of the substance of the charge, Besides, he knew of the occupancy of the lots `by the Company, and of their making their raceway thereon, and not only made no objection thereto, but was President and one of the acting managers of the Company at the time, and he does not deny that, as such President and acting manager, he took part in directing the proceedings of the Company in making their raceway through the said lots ; which is one of the charges made in the bill.

The said Company went on and finished their raceway, branches and improvements, at an expense of more than $200,000, and put their works in operation; and many mills and manufactories were erected along the route of the raceway, which are supplied with water therefrom.

In 1843, on a bill filed by creditors of the said Company, receivers were appointed; and, in February, 1844, the lands of the Company, including the raceway, were sold at public sale, and were bought by the Trenton Banking Company, the complainants in this suit.

In October, 1844, McKelway, the defenndant in this suit, commenced an action of ejectment against the said bank for the said lots.

The complainants say, in the bill, that if it shall appear that McKelway has not received from the said " The Trenton Delaware Falls Company" a suitable compensation for the said lots so taken and occupied by them, although they insist that McKelway should seek his redress therefor from the said Trenton Delaware Falls Company, and not from these defendants, yet the

complainants are ready and willing that the value of the said lots should be ascertained in the mode directed by the act incorporating the said Company, or in any other manner this Court may direct, and are ready and willing to pay the amount, so to be ascertained, in the manner this Court shall direct.

On the case thus made by the bill and answer, I am of opinion that the defendant should not be permitted to proceed in his action of ejectment to recover possession of such parts of the lands mentioned in the pleadings as are occupied by the raceway.

As to the lots purchased of Black, he assumed the agency to buy them for the Company, and bought them without giving any notice or intimation to the Company that he considered his agency for them at an end, and while the Company rightly supposed he was acting for them in his negotiations with Black. He must therefore be held to have acted for the Company in the purchase; and, having taken the deed in his own name, he must be considered as holding the title as trustee for the Company.

As to the other lot, the question involved is, whether the defendant, who was President, and one of the acting managers of the Trenton Delaware Falls Company at the time the raceway was located and constructed on and over this lot, and who not only made no objection to such location and construction, but took part in the direction of the proceedings of the Company therein, shall be permitted, after the Company have incurred the expense of locating and constructing their raceway, to oust them by ejectment from their possession so acquired. I am of opinion that he should not, and that the injunction should be continued. As to the course to be adopted beyond this, I am willing to hear the suggestions of counsel. Perhaps the prayer for further relief, connected with the offer made in the bill to pay the value of the lots thus occupied by the works of the Company, to be ascertained in such mode as the Court shall direct, may authorize the direction of an issue to ascertain such value.

The counsel consented that an issue should be directed, and it was ordered accordingly.